**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-CV-21384-MORENO**

RENATA CIRCEO-LOUDON and LOUIS J.
CIRCEO, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

                                      **CLASS ACTION**

v.                                           **JURY DEMAND**

GREEN TREE SERVICING, LLC, GREEN TREE
INSURANCE AGENCY, INC., and
AMERICAN RELIABLE INSURANCE
COMPANY,

        Defendants.

_____/

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs file this class action complaint on behalf of themselves, and all others similarly

situated against GREEN TREE SERVICING, LLC ("Green Tree Servicing" or "Green Tree"),

GREEN TREE INSURANCE AGENCY, INC. ("Green Tree Insurance") [collectively the

"Green Tree Defendants"], and AMERICAN RELIABLE INSURANCE COMPANY ("ARIC").

**INTRODUCTION**

**The Rise of Force-Placed Insurance Schemes**

1.      Many years ago, Assurant, Inc., its subsidiaries, including ARIC, and major

mortgage lenders devised a fraudulent scheme whereby Assurant's subsidiaries would offer loan-

tracking and insurance-placement services to the lenders and pay them unearned kickbacks

(essentially bribes) in exchange for an exclusive contractual relationship. The kickbacks to the

lenders and mortgage servicers take many forms, and are often characterized as legitimate

payments to conceal their actual purpose from consumers. For example, the kickbacks are often

characterized as "commissions" paid to an affiliate of the lender for brokerage services, but are in fact cycled through the affiliate, which does no work in connection with the borrower's forced placement, and paid back to the lender as pure profit. Kickbacks may also take the form of direct payments, "expense reimbursements," debt forgiveness, or discounted administrative services. Over time, these schemes have reaped the major mortgage lenders and the Assurant affiliates hundreds of millions of dollars in illegal and unearned profits.[1]

      2.      The Assurant subsidiaries and major mortgage lenders and servicers concealed these fraudulent practices from the public for many years, but the true nature of these schemes has recently been uncovered, in no small part due to considerable discovery conducted in numerous class actions lawsuits across the country (many before this Court), investigations by Florida, California, and New York insurance regulators, and an investigation by Fannie Mae and Freddie Mac, the federal agencies that guarantee more than 80% of all American homeowner mortgages.[2]

      3.      Mortgage lenders and services have been litigating force-placed insurance claims brought in class action lawsuits for more than three years, and have failed to procure dismissal in the vast majority the cases they have defended.[3]

      4.      As a result of discovery taken in prior FPI cases, as well as investigations by state

---

[1] A similar fraudulent FPI scheme was initiated by the other major force-placed insurer - QBE Insurance Group.

[2] These investigations and lawsuits revealed that: (1) every mortgage contract included a provision that allowed the bank/servicer to force-place insurance if the coverage lapsed, (2) many homeowners had such coverage lapse, (3) the contracts do not specify the actual "cost" of the force-placed insurance, and (3) Fannie Mae and Freddie Mac guaranteed the majority of the mortgages, so that if the homeowner did not pay such charges the government would eventually pay such amounts.

[3] *See, e.g., Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749-JIC 2014 U.S. Dist. LEXIS 41688 (S.D. Fla. Mar. 25, 2014); *Williams v. Wells Fargo Bank*, N.A., No. 11-cv-21233-CMA, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011).

regulators, mortgage lenders and servicers are beginning to curb their practices.  Moreover, Fannie Mae and Freddie Mac recently announced that they will require mortgage servicers to certify that they_no longer participate in many of the illegal practices alleged herein (i.e. bribes, kickbacks, and unearned commissions to related entities) in connection with any of their mortgages.

5.      While these new restrictions may help homeowners, this case against ARIC and the Green Tree Defendants remains necessary because: (1) most state and federal investigations did not result in monetary relief to injured homeowners from across the country, (2) new state restrictions apply only to residents in Florida, California, and New York, and (3) the federal restrictions can be amended at any time in the future.  This case is brought to provide monetary relief to the homeowner-victims, and ensure that ARIC and the Green Tree Defendants are enjoined by this Court from continuing these illegal practices nationwide.

<u>**Green Tree and Assurant's Force-Placed Insurance Program**</u>

6.      The Green Tree Defendants procure tens of millions of dollars in force-placed insurance coverage annually from ARIC and its affiliates, and subsequently charge borrowers amounts that include the cost of insurance plus the illegal bribes and kickbacks.

7.      Defendants' scheme works as follows.  Green Tree Servicing purchases master insurance policies that cover the entire Green Tree portfolio of mortgage loans.  In exchange, ARIC and its affiliates are given the exclusive right to force insurance coverage on the property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  ARIC and its affiliates monitor Green Tree Servicing's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, an Assurant, Inc. subsidiary, (in Plaintiffs' case, ARIC), sends notice to the

borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

8.     Green Tree charges borrowers more than what it actually pays for force-placed coverage, and thus charges borrowers more than the amount necessary to cover its own interest in the collateral for borrowers' mortgage loans.  The charges passed on to borrowers are artificially inflated by the Green Tree Defendants and ARIC to include the cost of bribes and some of the other unearned benefits described above, all of which are simply kickbacks paid by ARIC to the Green Tree Defendants to maintain an exclusive relationship.  Green Tree also passes on charges to the homeowners for unnecessary or "excess" coverage that is required neither by law nor the terms of the borrowers' mortgage loans.  These are all direct benefits to the Green Tree Defendants and ARIC and its affiliates.

9.     Plaintiffs here do not challenge the right of the Defendants to place insurance coverage in the first instance nor do they challenge the rates that ARIC files with any state insurance agency.  Instead, Plaintiffs challenge Green Tree's abuse of the discretion afforded to it in its mortgage contracts and Defendants' manipulation of the market for force-placed insurance to maximize their own profits.  Plaintiffs seek to recover the improper charges passed on to them and other Green Tree borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a contract or advantageous business relationship, and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and federal Truth in Lending Act ("TILA"), and Racketeer Influenced and Corrupt Organizations Act ("RICO").

10.     The money to finance the force-placed insurance schemes comes from unsuspecting borrowers like Plaintiffs who were charged inflated amounts for force-placed insurance by lenders or servicers – Green Tree here.  In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper costs.

11.     The major lenders and servicers, including Green Tree, collude with the ARIC and its affiliates to manipulate the force-placed insurance market for their own gain, leading to higher prices for force-placed insurance which servicers then charge to borrowers.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

12.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[4]

---

[4] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _presentation_birnbaum.pdf.

357747                                              5

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

13.    Assurant Inc., through its operating subsidiaries, like ARIC here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks or bribes disguised as "commissions," "expense reimbursements," direct payments, or the other benefits identified above.

357747                                      6

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

14.     It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and state regulators.  For example:[5]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[6]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ARIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At NYDFS hearings on May 17, 2012 related to the force-placed

---

[5] These practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

[6] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

357747                                          7

insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- As a result of its investigation, the NYDFS recently stated that "insurers offered financial incentives to mortgage servicers and their affiliates, including commissions to servicer-affiliated insurance producers who performed little or no work, and entered into arrangements that transferred a significant percentage of force-placed insurance profits to affiliates of servicers,"  and that "[t]hese practices not only artificially inflated premiums charged to homeowners, but created a conflict of interest in that servicers had an incentive to purchase more costly force-placed insurance where they earned a portion of the premiums or profits from the placement of force-placed insurance."[7]

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[8]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[9]

- Green Tree, a division of Walter Investment has had its own troubles relating to its mortgage servicing activities.  In 2014, it failed eight tests under the National Mortgage Settlement including failing to document its procedures to oversee third-party vendors – which would presumably include ARIC and its affiliates.

---

[7] *See* NYDFS Proposed 11 NYCRR 227: Regulation of Force-Placed Insurance.

[8] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*,  http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

[9] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

- Green Tree's parent Walter Investment Management Corp. disclosed in recent regulatory filing that its servicing division is facing regulatory scrutiny from more than just the Consumer Financial Protection Bureau and the Federal Trade Commission and anticipates receiving a "civil investigative demand" in the "near future."  It is also setting aside $17 million of new contingency reserves tied to its potential legal problems.

15.    Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

**LPI Premium by State:  Florida Has Become Ground Zero**

|      | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|------|------|------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8% | 8.7% | 7.0% | 5.6% | 5.6% | 6.1% |
| NY   | 3.6% | 3.6% | 4.5% | 4.4% | 4.3% | 4.7% | 5.4% | 5.6% |
| IL   | 3.0% | 3.3% | 3.9% | 3.7% | 3.9% | 4.4% | 4.1% | 4.6% |
| NJ   | 2.9% | 2.7% | 2.9% | 2.7% | 2.7% | 2.9% | 3.4% | 4.0% |
| MI   | 4.2% | 4.4% | 4.4% | 5.8% | 3.6% | 2.7% | 2.2% | 2.0% |
| OH   | 3.6% | 3.8% | 3.5% | 2.7% | 2.4% | 2.2% | 2.3% | 2.9% |
| GA   | 3.4% | 3.2% | 3.2% | 2.4% | 2.3% | 2.3% | 2.3% | 2.3% |
| PA   | 2.6% | 2.6% | 2.7% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |

CEJ LPI Presentation to NAIC                          15                                    August 9, 2012

16.    As a result, Florida has more forced-placed victims than any other state. Moreover, all of the force-placed actuary rates were set by ARIC and its affiliates – operating as Assurant Specialty Property – through their actuary department located in Miami, Florida.

17.    Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by Green Tree, Green Tree Insurance, and ARIC.

357747

## PARTIES

**Plaintiffs**

18.     Plaintiffs RENATA CIRCEO-LOUDON and LOUIS J. CIRCEO are citizens of the State of Georgia whose property is located in Miramar Beach, Florida.  They are natural persons over the age of 21 and otherwise *sui juris*.

**Defendants**

19.     Defendant AMERICAN RELIABLE INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, Inc. writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Scottsdale, Arizona. American Reliable often operates under the trade name "Assurant Specialty Property." American Reliable contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

20.     Upon information and belief, Assurant, Inc. owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including ARIC) to operate their force-placed insurance business under that name.

21.     Defendant GREEN TREE SERVICING, LLC is a mortgage servicer with its principal place of business in St. Paul, Minnesota.  Green Tree Servicing, LLC regularly conducts business in the State of Florida and throughout the United States.  Green Tree Servicing is owned by Walter Investment Management Corporation.

22.     Defendant GREEN TREE INSURANCE AGENCY, INC. ("Green Tree Insurance") is a Minnesota Corporation and also owned by Walter Investment Management

Corporation. Green Tree Insurance is an insurance agency that sells a variety of personal insurance products to consumers, including customers of Green Tree.  Green Tree Insurance also provides broker services only for Green Tree and its affiliates and consequently is the captive insurance broker for Green Tree.  Green Tree Insurance performs no functions related to the procurement of force-placed insurance coverage for individual borrowers, and yet collects a "commission" tied to a percentage of the cost of each force-placed insurance premium.  Green Tree Insurance is registered to do business in the State of Florida and regularly conducts business here and throughout the United States.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

24.     Plaintiffs are citizens of the State of Georgia with property in the State of Florida. Defendants are citizens of various other states but are registered to do business in Florida.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

25.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional

357747

notions of fair play and substantial justice.

26.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

27.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

28.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

29.     The standard form mortgage agreements used by Green Tree include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage to protect its interest in the property and charge the cost of that insurance coverage to the borrower rather than declare the borrow in default.

30.     What is unknown to borrowers and not disclosed in the mortgage agreements or by the Defendants, is that the Green Tree Defendants have exclusive arrangements with ARIC and its affiliates to manipulate the force-placed insurance process and artificially inflate the

357747

12

amounts charged to borrowers.  The amounts charged to borrowers are inflated to provide Green

Tree Servicing and its affiliates with kickbacks disguised as "commissions," expense

reimbursements, direct payments, debt forgiveness, or to cover the cost of discounted services, as

well as to include other unmerited charges.  The borrower is then forced to pay the inflated

charges.

### The Defendants' Force-Placed Insurance Scheme

31.    ARIC and its affiliates have exclusive arrangements with the Green Tree

Defendants to monitor their mortgage portfolio for lapses in insurance at below cost and provide

force-placed insurance.  In addition to subsidized mortgage services received from ARIC, a

percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to

Green Tree Insurance.  However, upon information and belief, the Green Tree Defendants keep a

single ledger account for revenues and expenses which are then passed up to their corporate

parents.  Therefore, the "commission" that Green Tree Insurance receives is effectively paid to

Green Tree Servicing as well.  The Green Tree Defendants receive additional kickbacks directly

through expense reimbursements, licensing fees, debt forgiveness, or direct payments. The

kickbacks described here are not paid for any legitimate purpose; they are simply bribes paid by

ARIC and its affiliates to keep their exclusive relationship with the Green Tree Defendants.

32.    Once a lapse is identified, ARIC or an affiliate sends a cycle of notices to each

borrower, on letterhead purporting to come from Green Tree, asking for proof of insurance and

stating that insurance will be "purchased" and force-placed if the voluntary coverage is not

continued.  If a lapse continues or proof of insurance is not submitted, the insurer notifies the

borrower, once again on Green Tree letterhead, that insurance is being force-placed at his or her

expense and issues an insurance certificate pursuant to the master policy.

33.     The letters or notices sent to borrowers are done pursuant to an automated system used by ARIC that generates and sends the letters at predetermined times.  The letters indicate an address for borrowers to submit proof of insurance or correspondence to Green Tree, however, the address is actually for an ARIC location because they are performing these services for Green Tree. Each borrower is subject to the Defendants' automated system and receives materially the same letters described above.

34.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and after the Green Tree pays the premium, it passes along the charges to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact.  However, due to the terms of the master policy between the Defendants, coverage is placed on the date of the alleged lapse (despite what the notices state), and even though there were no claims or damage to the property during the period of lapse, the borrower is billed retroactively for the insurance placed on the property and the borrower is charged for the "cost" of the past coverage.

35.     Once coverage is forced on the property, Green Tree pays the insurer and charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account, sometimes by ARIC, or added to the balance of the borrower's loan.  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.  On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

36.     Green Tree Servicing pays the premiums to the insurers who then kick back a set percentage to Green Tree Insurance as a "commission."  As described above, that payment is

shared with Green Tree Servicing.

37.     The money paid back to Green Tree Insurance is not given in exchange for any services provided by it; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, ARIC sends notices to borrowers, on Green that disclose that Green Tree affiliates may earn commissions or income as a result of "obtaining the force-placed policy" through that affiliate.

38.     In reality, however, no work is ever done by Green Tree Insurance to procure insurance for that particular borrower because the coverage comes through the master policy already in place.  Green Tree Insurance has no contact with borrowers, does not seek out insurance policies on their behalf, and has no involvement in the placing of the insurance or the collection of the charges from the borrower.  For example, Andrew Jeska purports to serve as an agent or producer authorized to sell or produce force-placed insurance on behalf of Assurant; however, Mr. Jeska is employed as a Vice President at Green Tree Servicing and performs no duties that would entitle either him or Green Tree Insurance Agency to collect a commission; instead, Mr. Jeska and Green Tree Insurance merely pose as "agents" and/or "producers" in order to make the payments to Green Tree appear legitimate.  As a result, the amount paid is not a true "commission,"  no income is "earned," and the Green Tree Defendants do not incur any costs in relation to the force-placement of insurance for any particular borrower.

39.     The Defendants have simply labeled this kickback as a "commission" to disguise its true nature – a bribe to keep the exclusive relationship in place.

40.     The Defendants never disclose to Plaintiffs or other borrowers through the notices or by any other means, the amounts of the "commissions" or that Green Tree pays less than the amount that it charges the borrower.  Nor do the Defendants disclose their exclusive relationship

or that the Green Tree Defendants are receiving the below-cost services and the other improper

kickbacks described above and that these kickbacks will be ultimately charged to the borrower.

41.     Under this highly profitable force-placed insurance scheme, Green Tree Servicing

is incentivized to purchase and force place high-cost insurance policies on a borrowers'

properties because the higher the cost of the insurance policy, the higher the kickback.

42.     Green Tree also receives "qualified expense reimbursement" payments from ARIC

and its affiliates.  These "expense reimbursements" are not legitimate reimbursements for actual

costs and were simply another form of a bribe to Green Tree for the exclusive arrangement to

force-place insurance.  Neither Green Tree nor its affiliates perform any bona fide services or incur

any costs for the payments that they received, and these payments were never disclosed to

borrowers

43.     The Defendants also enter into agreements for ARIC and other Assurant affiliates

to provide servicing activities on the Green Tree Defendants' entire loan portfolio at below cost.

These servicing costs are recouped through the force-placed premiums paid by the Green Tree

Defendants and subsequently charged to the borrower.

44.     The Green Tree Defendants paid ARIC and its affiliates a per loan fee to among

other tasks, monitor borrowers' loans, send the notices, and issue the force-placed insurance

certificates.  The per loan fee cost Green Tree much less than what it would have cost them to

perform these functions themselves.

45.     The fee was also less than the true cost of these services to ARIC and its affiliates.

They are able to provide these services at below cost because of the enormous profits they make

from force-placed insurance where they have inflated the premiums to cover the cost of

providing these services and know that it will be ultimately charged by Green Tree to the

borrower.

46.     ARIC and its affiliates are able to provide these services at below cost because of the enormous profits they make from the high cost insurance charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1-2% of the lender's total mortgage portfolio, the borrowers who pay these charges unfairly bear the entire cost to service the entire loan portfolio.  These charges, passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities by the owners of the loans.

47.     The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring Green Tree Servicing's entire loan portfolio, effectively resulting in a kickback.

48.     In addition, ARIC and its affiliates have entered into a meaningless "licensing arrangement" that has provided millions of dollars to the Green Tree Defendants. ARIC and its affiliates have also provided "expense reimbursements" and forgiven various debts owed to them.  Similar to the "commissions" described above, this compensation is actually nothing more than another means for ARIC to pay bribes to the Green Tree Defendants for the exclusive right to force-place insurance on its borrowers.

49.     Green Tree Servicing also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in Plaintiffs' and the borrowers' standard form mortgage agreements.  These clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy. Force-placed policies, however, take effect on the date of termination, and "double-cover" the

17

property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause. This means the borrower is charged for coverage for which the lender or servicer has no exposure.

50.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when Green Tree Servicing adds the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

51.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated, illegitimate, and noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of discounted administrative services and other costs described above.

52.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase a force-placed insurance policy.  Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender/servicer, here, Green Tree, and the insurer, here, ARIC.

53.     Servicers, like the Green Tree Defendants, are financially motivated to select the insurer, like ARIC, that offers it the best financial benefit in the terms of "commissions," direct payments, discounted tracking services, or debt forgiveness.  This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for

Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

**Plaintiffs Renata Circeo-Loudon and Louis J. Circeo**

54.     Plaintiffs Renata Circeo-Loudon and Louis J. Circeo (the "Circeo Plaintiffs") took a mortgage loan from The Bank of Bonifay in June 2007, secured by a mortgage on real property in Miramar Beach, Florida.

55.     The Circeo Plaintiffs' mortgage agreement provides as follows:

**5. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained In the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

…

357747                                    19

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

56.     The mortgage was subsequently transferred to Countrywide Home Loans and then to Green Tree and is attached hereto as **Exhibit A**.

57.     In June 2012, the hazard insurance coverage on the Circeo Plaintiffs' property lapsed.  The annual premium they were paying was approximately $1,338.  Although a check for renewal was sent to the voluntary insurer, Universal Property and Casualty, it claimed it never received the payment.

58.     On July 31, 2012, pursuant to the automated procedures in place, ARIC on Green Tree letterhead sent a notice requesting the Plaintiffs' proof of insurance.

59.     On August 30, 2012, a second warning letter was sent to Plaintiffs through the U.S. mail indicating the cost of the lender placed insurance will be $4,331.25 – more than three times the cost of Plaintiffs' prior policy.

60.     On September 21, 2012, Plaintiffs obtained a voluntary policy from Citizens with an annual premium of approximately $1650.00.  Proof of insurance was sent to Green Tree.

61.     On September 25, 2012, ARIC confirmed cancellation of a policy obtained by Green Tree, however Plaintiffs were charged for the lapse period from May 2012 until October 2012 in the amount of $1,845.82.

62.     Plaintiffs were charged for and paid the amounts for force-placed coverage in

connection with the policy that Green Tree placed on their property.   Similar to all other Green Tree borrowers, at no time did any Defendant disclose, by any means, to Plaintiffs that an exclusive relationship between Green Tree and ARIC was already in place and the "commission" paid to a Green Tree affiliate was not paid for any work but simply a bribe to keep that exclusive force-placed relationship in place.

63.     It was also never disclosed to Plaintiffs or the class that because of this kickback, Green Tree itself would effectively be paying a reduced amount of what it charged to Plaintiffs for the force-placed insurance coverage.   Finally, it was never disclosed to Plaintiffs or the class that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage services not properly charged to them.

64.     There are no material differences between these Defendants' actions and practices directed to Plaintiffs and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.     Class Definitions

65.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

**Nationwide class:**

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property through the Green Tree Defendants and/or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

**Florida Subclass as to Count V – Florida Deceptive and Unfair Trade Practices Act:**

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State of Florida, through the Green Tree Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

66.    Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

67.    Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.    Numerosity**

68.    The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the state of Florida, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.    Commonality**

69.    There are questions of law and fact that are common to Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the

357747                                   22

following:

a. Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

b. Whether Green Tree Servicing breached the mortgage contracts with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and other payments) and by charging Plaintiffs and the Class for servicing their loans;

c. Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

d. Whether Green Tree breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with ARIC and its affiliates, which resulted in inflated amounts for insurance being charged to Plaintiffs and the Class;

e. Whether Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

f. Whether Green Tree affiliates perform any work or services in exchange for the "commissions" or other compensation they collect;

g. Whether the charges to Plaintiffs and the Class are inflated to include kickbacks and unwarranted "commissions;"

h. Whether the charges to Plaintiffs and the Class are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i. Whether the Green Tree Defendants violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

j. Whether Green Tree Servicing violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

k. Whether an objective consumer would be deceived by Green Tree's arrangement, which incentivizes Defendants to charge inflated and unnecessary amounts for force-placed insurance, and therefore violates FDUTPA;

357747                                  23

l.   Whether  ARIC intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio;

m.   Whether Defendants were associated with the enterprise and agreed and conspired to violate the Federal RICO statutes;

n.   Whether Defendants' practices constitute mail fraud; and

o.   Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.   <u>Typicality</u>**

70.   Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.   <u>Adequacy of Representation</u>**

71.   Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

72.   To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F.     **Requirements of Fed. R. Civ. P. 23(b)(3)**

73.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

74.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

75.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

G.     **Superiority**

76.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

77.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

78.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(against Green Tree Servicing)**

79.    Plaintiffs incorporate paragraphs 1-64 as if fully set forth in Count I.

80.    Plaintiffs and all similarly situated class members have mortgages that are owned and/or serviced by Green Tree Servicing.

81.    Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Green Tree Servicing.   The force-placed provision from Plaintiffs' mortgage is set forth above in Paragraph 56.

82.    Paragraph 5 of Plaintiffs' mortgage requires that they maintain insurance on their property and provides that if they fail to do so, then the lender or servicer may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower.  Paragraph 9 of Plaintiffs' mortgage further provides that the "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property,

and securing and/or repairing the Property."

83.     Green Tree Servicing charges borrowers amounts for force-placed insurance that include unearned "commissions" and other kickbacks, as well as bundled administrative and other impermissible costs.   These costs are not costs of coverage, and are not applied to protecting Green Tree Servicing's rights or risk in the collateral for borrowers' mortgage loans. They are simply bribes to keep the Defendants' exclusive relationship in place.

84.     Through the kickbacks it receives, Green Tree effectively pays a much lower amount for force-placed coverage than what it charges to Plaintiffs and other Class members.

85.      Green Tree Servicing breached the mortgage agreements by, among other things, charging Plaintiffs and absent class members the amounts beyond the actual cost of coverage.

86.     Green Tree Servicing also breached Plaintiffs' and class members' mortgage agreements by charging Plaintiffs and the Class for duplicative insurance for the time period in which Green Tree is already covered by the Lenders Loss Payable Endorsement of the Standard Mortgage Clause as such coverage does not protect the Green Tree Defendants' rights in their collateral or cover their risk.

87.     Plaintiffs and the Class members have suffered damages as a result of Green Tree Servicing's breaches of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from Green Tree Servicing's breaches of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages.   Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

**COUNT II**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(against Green Tree Servicing)**

88.     Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count II.

89.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

90.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

91.     Plaintiffs' and the Class members' mortgage contracts allow Green Tree Servicing to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

92.     Green Tree Servicing is afforded substantial discretion in force-placing insurance coverage.  It is permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate any price for the coverage it procures.  Green Tree Servicing has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.  Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

93.     Green Tree Servicing breached the implied covenant of good faith and fair dealing by, among other things:

> (a)  Manipulating the force-placed insurance market by selecting insurers (here, ARIC and its affiliates) that sell high-priced insurance that includes kickbacks to Green Tree affiliates and issue excess insurance coverage not necessary to cover Green Tree Servicing's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back

357747                                           28

room" deals whereby insurance coverage is routinely purchased from ARIC and its affiliates without seeking a competitive price;

(b)  Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

(c)  Assessing inflated and unnecessary charges for force-placed insurance against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(d)  Allowing Green Tree affiliates, including Green Tree Insurance, to collect a percentage of the charges to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)  Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(f)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class and where Green Tree is already paid for these expenses by the owners of the loans;

(g)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h)  Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan.

94.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the Green Tree's conduct described above and the amounts charged to borrowers are in contravention of its duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Green Tree Servicing's breaches of their duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

## UNJUST ENRICHMENT
### (against the Green Tree Defendants)[10]

95.     Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count III.

96.     The Green Tree Defendants and their affiliates received from Plaintiffs and Class members, benefits in the form of inflated amounts charged to borrowers for insurance related to force-placed insurance policies, unwarranted kickbacks in the form of "commissions," expense reimbursements, debt forgiveness, meaningless "licensing agreements," and subsidized loan servicing costs.

97.     These Defendants entered into an agreement whereby American Reliable would provide force-placed insurance coverage to Green Tree Servicing for the portfolio of loans monitored on its behalf.   Green Tree Servicing would then charge Plaintiffs and the Class amounts that had been artificially inflated to include costs not properly chargeable to the borrower.   The force-placed coverage imposed on borrowers was therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

98.     These Defendants also collected amounts for force-placed insurance that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

99.     ARIC paid and collected significant monies in kickbacks, tied directly to the cost of the force-placed insurance coverage.   Commissions or kickbacks were paid directly to the Green Tree Defendants and/or their affiliates in order to be able to exclusively provide force-placed insurance policies.   ARIC was a mere conduit for the delivery of the kickbacks, "commissions," and other charges to the Green Tree Defendants and/or their affiliates.

---

[10] Plaintiffs plead their unjust enrichment claim against Green Tree Servicing in the alternative to their contractual claims against it.

100.    These payments directly benefitted the Green Tree Defendants and/or their affiliates and were taken to the detriment of the borrower.  The kickbacks, commissions, expense reimbursements, debt forgiveness, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

101.    Further, the Green Tree Defendants received financial benefits in the form of increased interest income and duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

102.    As a result, Plaintiffs and the Class have conferred a benefit on the Green Tree Defendants.

103.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them. Had Plaintiffs and the Class known that the amounts Green Tree charged them included the costs of the kickbacks and other improper charges, they would have expected to be charged and/or paid less

104.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Green Tree Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT
### (against American Reliable)

105.    Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count IV.

106.    Plaintiffs and the Class directly conferred benefits on ARIC.  Specifically, ARIC received from Plaintiffs and the Class members, benefits in the form of funds for force-placed insurance.

107.    Neither Plaintiffs nor the class members have ever entered into any written contracts with the ARIC or its affiliates.

108.    All of the subject mortgages are between Plaintiffs and the Green Tree Defendants.

109.    Green Tree Servicing contracted with the ARIC and its affiliates to procure a master insurance policy which covers Green Tree Servicing's entire portfolio of mortgage loans. Neither Plaintiff is party to this agreement.

110.    Moreover, this agreement does not govern the subject matter of this lawsuit.   The agreement does not, for example, authorize the payment of kickbacks.

111.    ARIC received below-cost payments from Green Tree Servicing for providing tracking services but included the entire cost of that tracking service in the premiums for force-placed insurance that Green Tree Servicing ultimately charged to its borrowers.  ARIC knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them but did not reduce the charges by the amounts paid to them from the Green Tree Defendants for the tracking services.

112.    ARIC paid significant monies to the Green Tree Defendants in kickbacks or "commissions" tied directly to the cost of the force-placed insurance premium (as a percentage).

357747                                          32

Bribes, unearned commissions and/or kickbacks were paid directly to the Green Tree Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

113.    Green Tree Servicing also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

114.    Upon information and belief, ARIC accessed Green Tree Servicing's databases and directly withdrew money from the Plaintiffs' escrow accounts to collect the charges for force-placed insurance including the illegal bribes and kickbacks.  In other cases, the Green Tree Defendants were mere conduits for the delivery of insurance charges to ARIC which included the illegal bribes and kickbacks.

115.    As a result, Plaintiffs and the Class have conferred a direct benefit on ARIC.  In many cases, the benefit to ARIC included direct withdrawals of the inflated policy premiums from Plaintiffs' accounts and in all cases, ARIC benefited from the illegal force-placed insurance charges and not via some other service that they were providing for the Green Tree Defendants.

116.    ARIC had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

117.    ARIC will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which ARIC were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against ARIC in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and

proper.

**COUNT V**

**VIOLATION OF FDUTPA**
**(against the Green Tree Defendants)**

118.     Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count V.

119.     FDUTPA, section 501.201, *et seq*., Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

120.     Plaintiffs and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

121.     The Green Tree Defendants have engaged in, and continue to engage in, unconscionable acts or practices and have engaged in unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

122.     The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by the above-named Plaintiffs and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for the Green Tree Defendants.

123.     Specifically, Green Tree Servicing had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiffs and the Florida Subclass, and then receive compensation through kickbacks based on a percentage of the insurance policy's premium as well as kickbacks in various other forms including, subsidized costs, direct payments, "expense reimbursements," and debt forgiveness.   This effectively resulted in Green Tree paying less than the amount it charged to Plaintiffs and the class.

124.    The Green Tree Defendants' conduct of charging borrowers inflated amounts for their force-placed insurance to Plaintiffs and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

125.    Neither Green Tree Defendant is a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, neither entity is a bank or savings and loan association regulated by federal agencies.

126.    Plaintiffs and the Florida Subclass have sustained damages as a direct and proximate result of the Green Tree Defendants' unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs and the Florida Subclass a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

127.    Plaintiffs and the Florida Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Florida Subclass, demand judgment against the Green Tree Defendants for damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

<u>**COUNT VI**</u>
<u>**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.***</u>
<u>**(against Green Tree Servicing)**</u>

128.    Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count VI.

129.    Plaintiffs' and the Class members' mortgages were consumer credit plans secured

by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

130.    Green Tree Servicing is a "creditor" as defined by TILA because it owned Plaintiffs' mortgage and changed the terms of the mortgage so as to create a new mortgage obligation, of which Green Tree Servicing was the creditor.

131.    Pursuant to TILA, Green Tree Servicing was required to accurately and fully disclose the terms of the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

132.    Green Tree Servicing violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, discount loan monitoring, and/or other profiteering involving Green Tree Servicing and/or its affiliates as a result of the purchase of force-placed insurance.

133.    When Green Tree Servicing changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of Green Tree Servicing's interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, Green Tree Servicing was then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, Green Tree Servicing increased the principal amount under Plaintiffs' mortgage when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

134.    Green Tree Servicing adversely changed the terms of Plaintiffs' loan after

origination in order to allow their affiliate to receive a kickback on force-placed insurance premiums. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. Green Tree Servicing has never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

135. Green Tree Servicing also violated TILA by adversely changing the terms of Plaintiffs' loan after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

136. Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Green Tree Servicing's kickback and other unearned revenue-generating scheme was the subject of secret agreements among Green Tree Servicing and its affiliates and was concealed from borrowers.

137. Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from Green Tree Servicing's violations of TILA.

138. As a result of Green Tree Servicing's TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

139. Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the Green Tree Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Green Tree Servicing awarding actual damages and a penalty of $500,000.00 or 1% of the Green Tree Servicing's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by the Green Tree Defendants, as provided by 15 U.S.C. § 1640(a)(3).

357747

## COUNT VII

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against ARIC)

140.    Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count VII.

141.    Plaintiffs and the Class members have advantageous business and contractual relationships with Green Tree Servicing pursuant to their mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant amounts in bad faith for forced-place insurance.

142.    Plaintiffs allege that Green Tree Servicing breached their mortgage contracts with Plaintiffs and that ARIC intentionally and unjustifiably caused the breach.

143.    ARIC solicited Green Tree Servicing and proposed a fraudulent plan, whereby it would intentionally interfere with the existing relationship between Plaintiffs and Green Tree to obtain the exclusive rights to track and force place insurance upon Green Tree's mortgage loan portfolio, and, upon information and belief,  withdraw funds from the Plaintiffs' escrow accounts that include illegal kickbacks, such that both ARIC and the Green Tree Defendants have been able to reap tens of millions of dollars in illegal profits.

144.    ARIC has knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and Green Tree.  ARIC is not a party to the mortgage contracts, nor is it a third-party beneficiary of the mortgage contracts. Further, ARIC does not have any beneficial or economic interest in the mortgage contracts.

145.    ARIC intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Green Tree Servicing and its affiliates, whereby it provides bribes (kickbacks, debt forgiveness, low cost services…etc.) to the Green Tree Defendants in exchange for the

exclusive right to force-place high-priced and unnecessary amounts for force-placed insurance which are purposefully and knowingly charged to Plaintiffs and the Class.

146.     Plaintiffs and the Class have been directly damaged as a result of ARIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges and bribes for force-placed insurance, in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members similarly situated, seek a judgment in their favor against ARIC for the actual damages suffered by them as a result of their tortious interference.   Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY
## (against Green Tree Servicing)

147.     Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count VIII.

148.     Green Tree Servicing holds funds in escrow on behalf of borrowers whose mortgages it services.  These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

149.     Green Tree Servicing has fiduciary relationships with Plaintiffs and the Class because it receives a greater economic benefit from these transactions than it would from a typical escrow transaction.   Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Green Tree Servicing exercised discretionary authority as an escrow agent by choosing among insurance providers and withdrawing money from borrowers' escrow accounts to pay charges imposed for force-placed insurance.  Green Tree Servicing violated its

357747

fiduciary duties when it engaged in self-dealing by arranging to receive the payment of unlawful kickbacks under the above-described kickback scheme.

150.   Green Tree Servicing breached its fiduciary duties to Plaintiffs and other members of the proposed class by: (1) not acting in borrowers' interest when it chose to purchase force-placed insurance from the ARIC and its affiliates in return for kickbacks using escrow funds they held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members; and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

151.   These actions were undertaken by Green Tree Servicing in bad faith for its own benefit and were not intended to benefit these Plaintiffs or other proposed Class members.

152.   As a direct result of Green Tree Servicing's actions and subversion of Plaintiffs' interest to its own in reaping extravagant and outrageous fees, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs and the proposed class they seek to represent are entitled to damages for Green Tree Servicing's breaches of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because Green Tree Servicing acted in bad faith in deliberate or reckless disregard of both their rights and Green Tree Servicing's obligation to hold their escrow funds in trust.

## COUNT IX

### Violation of RICO, 18 U.S.C. § 1962(c)
### (Plaintiffs against All Defendants)

153.   Plaintiffs incorporate paragraphs 1-64 herein as if fully set forth in Count IX.

154.   At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of

racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

155.    The RICO enterprise, which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the Green Tree Defendants, Assurant, Inc., and ARIC and its affiliates.

156.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with monitoring Green Tree's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges.  Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

157.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

158.    The Green Tree Defendants, Assurant, and ARIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

159.    The Green Tree Defendants and ARIC directed and controlled the enterprise as follows:

- ARIC specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to

borrowers about force-placed insurance, to which the Green Tree Defendants agreed;

- ARIC drafted of the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from the Green Tree Defendants.  The letters fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by the Green Tree Defendants;

- ARIC ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking Green Tree's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a Green Tree affiliate would be paid a commission as compensation for work performed;

- ARIC paid kickbacks to Green Tree and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

- by directing, controlling, and creating an enterprise and arrangement by which the Green Tree Defendants would receive unearned kickbacks;

- by directing, controlling, and creating an enterprise and arrangement by which the Green Tree Defendants would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, debt forgiveness, expense reimbursements, or licensing fees that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

- by directing, controlling, and creating an enterprise and program by which Green Tree never charged the borrowers its actual or effective cost to procure the lender placed policies;

- by directing, controlling, and creating an enterprise and program where ARIC took money directly from borrowers escrow accounts  and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks;

- by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance.  The charges were inflated to provide the Green Tree Defendants and their affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted services, and/or to provide the Green Tree Defendants with lucrative debt forgiveness or "licensing" fees.  ARIC benefits by securing business from

the Green Tree Defendants—it provides kickbacks to them at the expense of the borrowers who are charged the inflated charges;

- by developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

- by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

160.     In order to further its control and direction of the enterprise, ARIC paid bribes and kickbacks to the Green Tree Defendants in the form of unearned commissions, direct payments, expense reimbursements, licensing fees, and below cost services.

161.     As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive them.

162.     For example, ARIC, with the approval of the Green Tree Defendants, sent form letters to Plaintiffs on Green Tree letterhead through the U.S. mail, stating that Green Tree would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.  These Defendants represented in the letters that Green Tree would purchase the required coverage and charge the borrower "the premium amount" or "the cost of the insurance."  In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the actual "cost" of the policies, when in fact such amounts also included kickbacks and other costs paid as bribes to the Green Tree Defendants, and Plaintiffs were charged significantly more than Green Tree had

paid for coverage.

163.    Defendants had a duty to correct this mistaken impression.   These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiffs unreasonably high amounts for force-placed insurance and were designed to lull Plaintiffs and the class into believing that the charges were legitimate.   Plaintiffs (and other homeowners) would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included and that these forced-charges did not represent simply the "cost" of the required insurance coverage.[11]   Such letters were sent to Plaintiffs through the U.S. mail on July 31, 2012 and August 30, 2012.

164.    ARIC, with the approval of the Green Tree Defendants and on Green Tree letterhead, also sent Plaintiffs force-placed insurance notices through the U.S. mail informing them that force-placed insurance was purchased to protect "our interest [in the loan,]" when in fact, the amounts charged Plaintiffs and the class included kickbacks and other impermissible costs that bore no relation to Green Tree's interest in the loan.   Defendants had a duty to correct this mistaken impression.

165.    The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably inflated amounts for insurance and would have influenced Plaintiffs' decisions whether to pay the charges or contest them.   For example, had Plaintiffs known that Green Tree was effectively paying much less than what it charged to Plaintiffs; Plaintiffs would not have paid or would have contested the charges for force-placed insurance.   One such letter

---

11 "A plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation that it relied on defendant's alleged misrepresentations."   *See Bridge v. Phoenix Bond & Indemnity Co*., 553 U.S. 639, 661 (2008).   The focus is whether Plaintiff can show that the Defendants used the U.S. mail to *further the scheme* to defraud and that their injury was proximately caused by the *alleged scheme*, not just the specific letter.   *Wallace*, 714 F.3d 414 (6th Cir. 2013).

including this misrepresentation was sent to the Plaintiffs on July 31, 2012.

166.    The letters sent also included the representation that the insurance would be "obtained through an affiliated insurance agency" and that the Green Tree affiliate would earn commissions or income.  This statement was inaccurate because coverage was not procured for individual borrowers with a Green Tree affiliate's assistance; a master policy was already in place.   And the payments to Green Tree affiliates, including Green Tree Insurance, were kickbacks, not earned income or commissions, and were not paid to the affiliates in connection with any work performed in connection with the new coverage forced on the borrower's property. Defendants had a duty to correct this mistaken impression.

167.    These omissions were material, as they gave Defendants a colorable reason to charge Plaintiffs unreasonably inflated amounts for insurance and would have influenced Plaintiffs' decisions whether to pay the charges or contest them.  Plaintiffs would not have paid or would have contested the charges for force-placed insurance if Defendants had disclosed that the amounts included these unearned kickbacks and did not represent simply the "cost" of the insurance coverage.

168.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance.

169.    This scheme to defraud proximately injured Plaintiffs and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property.  Had they

known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

170.     By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT X

### Violation of RICO, 18 U.S.C. § 1962(d)
### (Plaintiffs against all Defendants)

171.     Plaintiffs incorporate paragraphs 1-64 and 154-170 herein as if fully set forth in Count X.

172.     At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

173.     Green Tree and ARIC illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- agreeing that ARIC would be Green Tree's exclusive force-placed insurance provider and would extract unreasonably inflated amounts from Green Tree's customers. Defendants also agreed that ARIC would pay kickbacks to Green Tree affiliates;

- agreeing that ARIC would monitor Green Tree's mortgage portfolios for lapses in voluntary insurance and would, with the approval of Green Tree Servicing, send misleading notices to borrowers. These misleading notices would inform the borrowers

that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a Green Tree affiliate;

- entering into illusory commission, licensing or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

- agreeing to commit two or more predicate acts as described above in Count VIII.

174.     Through general ledger accounts, Green Tree affiliates, including Green Tree Insurance, pass profits from this scheme to Green Tree Servicing.

175.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

176.     As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class and the Florida Subclass;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of Green Tree Servicing's breaches of the subject mortgage contracts and the implied covenant of good faith

and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiffs and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant Defendants' tortious interference;

(8)     Awarding actual damages and a penalty of $500,000.00 or 1% of Green Tree Servicing's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

357747

Respectfully submitted this 17th day of October, 2014.

By: */s/ Adam M. Moskowitz*

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:    (305) 536-8220<br>Facsimile:    (305) 536-8229<br>*Counsel for Plaintiffs* | Chip Merlin, Esq.<br>cmerlin@merlinlawgroup.com<br>Philip Sanov, Esq.<br>psanov@merlinlawgroup.com<br>Shaun Marker, Esq.<br>smarker@merlinlawgroup.com<br>**MERLIN LAW GROUP, P.A.**<br>777 S. Harbour Island Blvd., Suite 950<br>Tampa, FL 33602<br>Telephone: 813-229-1000<br>Facsimile: 813-229-3692<br>*Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing un-redacted document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Robert J. Neary*

357747